## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

LISA MARIE ODIORNE,

     Plaintiff,

v.

RIVERHOUSE CHILDREN'S CENTER, INC.,

     Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Lisa Marie Odiorne ("Plaintiff" or "Ms. Odiorne"), by and through her undersigned counsel Hunter A. Swain of SWAIN LAW, LLC, submits this Complaint and Jury Demand against Defendant Riverhouse Children's Center, Inc. ("Defendant" or "Riverhouse") as follows:

### INTRODUCTION

1.    In this employment discrimination and workplace tort action, Plaintiff Lisa Marie Odiorne brings claims against her former employer Riverhouse for (1) unlawful retaliation in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 623(d); (2) the Colorado common law tort of wrongful discharge in violation of public policy; and (3) the Colorado common law tort of outrageous conduct.

2.      Riverhouse is a daycare and preschool located in Durango, Colorado. Working parents throughout the Durango area trust Riverhouse to provide a safe and nurturing environment for their children as young as six weeks old.

3.      But in early 2020, Riverhouse betrayed that trust by covering up child abuse against babies entrusted to its care.

4.      In January 2020, Ms. Odiorne reported to Riverhouse that Serena Owen, the Lead Teacher in Riverhouse's "Hummingbird" classroom for children between six months and eighteen months old, had engaged in aggressive and physically-violent abusive behaviors toward children in the classroom.

5.      Riverhouse responded by asking Ms. Odiorne to forget about the violence she had observed and move on.

6.      But Ms. Odiorne refused to ignore the abuse, and instead reported it to the La Plata County Department of Human Services.

7.      After conducting an on-site investigation, the Colorado Department of Human Services substantiated Ms. Odiorne's abuse complaints and concluded that Riverhouse had violated the law by failing to report the abuse.

8.      Shortly after her child abuse complaints were substantiated, Ms. Odiorne also complained of age discrimination after Riverhouse passed her up for promotion in favor of a less-qualified woman almost thirty years younger.

9.      In March 2020, Riverhouse abruptly fired Ms. Odiorne in retaliation for her child abuse and age discrimination complaints.

10.     Riverhouse went to extraordinary lengths to cover up the child abuse it knew to be occurring against the children in its care. In addition to firing Ms. Odiorne to silence her, Riverhouse lied to the parents of affected children in an attempt to shield itself from consequences.

## JURISDICTION AND VENUE

11.     This action arises under the Constitution and laws of the United States of America and the State of Colorado. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331 & 1343; and 42 U.S.C. § 1988, as amended by the Civil Rights Attorney Fee Award Act of 1976.

12.     This action is authorized and instituted pursuant to Section 7 of the ADEA, 29 U.S.C. § 626(c)(1).

13.     This action is further authorized and instituted pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

14.     This action is authorized by and instituted pursuant to the common law of the State of Colorado.

15.     Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists among the Parties.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3), as all of the events giving rise to the claims asserted herein occurred in the District of Colorado of the United States of America.

## PARTIES

17.     Plaintiff Lisa Marie Odiorne is a 49-year-old woman who, at all times during the events described in this Complaint and Jury Demand, was a resident of the State of Colorado.

18.     Ms. Odiorne is currently a resident of the State of California.

19.     Throughout her employment at Riverhouse, Ms. Odiorne was among the class of persons protected against unlawful age discrimination and retaliation under the ADEA, 29 U.S.C. § 621 *et seq.*

20.     Defendant Riverhouse Children's Center, Inc. is a Colorado nonprofit corporation with its principal offices located at 742 Florida Road, Durango, CO 81301.

21.     At all material times, Riverhouse was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

22.     Riverhouse purposefully availed itself of the privilege of conducting business in the State of Colorado and within the United States District for the District of Colorado. This Complaint arises out of the Defendant's contacts with Colorado.

23.     Riverhouse employed Plaintiff to conduct business entirely within the State of Colorado and the United States District for the District of Colorado.

## GENERAL ALLEGATIONS

### In late 2019, Ms. Odiorne begins observing rough and aggressive behaviors by Lead Teacher Serena Owen toward the babies in their classroom.

24.     Riverhouse Children's Center is a child development center providing child care and early education services for children from six weeks through five years old.

25.     In May 2019, Riverhouse hired Ms. Odiorne as a Teacher Assistant.

26.     In late 2019, Riverhouse employed Ms. Odiorne as a Teacher Assistant in a classroom for children between six months and eighteen months old, which Riverhouse called the "Hummingbird" classroom.

27.     In late 2019, Riverhouse employed Serena Owen as the Lead Teacher in the Hummingbird classroom.

28.     In late 2019, Riverhouse employed Verinda Pepin as a Teacher Aide in the Hummingbird classroom.

29.     In late 2019, Ms. Odiorne and Pepin began to notice that Owen often appeared to have difficulty controlling her frustration with the babies entrusted to their care in the Hummingbird classroom.

30.     For instance, Ms. Odiorne and Pepin observed that Owen would often become visibly angry with babies who cried too much or resisted having their diapers changed.

31.     In late 2019, Ms. Odiorne began to observe that when Owen became frustrated, she became rough and aggressive with the babies, including grabbing them by their arms and forcefully tossing them on changing tables.

32.     After observing Owen's visible frustration, on multiple occasions Ms. Odiorne and Pepin attempted to reason with Owen by asking her why she lost her temper so easily. Ms. Odiorne and Pepin also explained to Owen that her actions were not showing the children the care and tenderness they deserved.

33.     In response to Ms. Odiorne and Pepin, Owen always admitted that her behavior was wrong and promised to be more patient and gentler with the kids.

34.     But Owen's aggressive behavior escalated over the following months.

**_In January 2020, Ms. Odiorne reports multiple incidents of child abuse by Owen._**

35.     Over time, Ms. Odiorne became concerned that that Owen's angry behavior may be skirting the line of child abuse, and she became increasingly concerned for the safety of the children.

36.     On January 16, 2020, Pepin witnessed Owen lose her temper with a child of approximately one year old pseudonymously called "Baby One."[1]

37.     While Baby One was on the playground he began crying. Visibly upset and losing her temper, Owen forcefully shoved a pacifier into the crying boy's mouth. She then held the boy's face (with the pacifier forcefully crammed inside his mouth)

---

[1] Ms. Odiorne does not identify Baby One or his parents by name in this Complaint and Jury Demand because of the child's age and the sensitive events described herein.

against her body so he would not spit the pacifier out. Unsurprisingly, Owen's violent reaction frightened and distressed the boy, making him cry harder.

38.     Pepin immediately intervened and physically separated Baby One from Owen.

39.     That same afternoon, on January 16, 2020, Pepin resigned from Riverhouse without notice. Before Pepin left Riverhouse, Pepin reported to Program Director Colombe Girolimon that she had observed Owen's behaviors toward the children become increasingly aggressive over the previous months.

40.     Girolimon responded to Pepin's report by asking Pepin to write down a list of Owen's behaviors that Pepin had observed. Pepin did so.

41.     Later in the afternoon of January 16, 2020, Ms. Odiorne met with Girolimon and Owen to discuss Ms. Odiorne's perspective on why Pepin had unexpectedly resigned.

42.     During her meeting with Girolimon and Owen, Ms. Odiorne reported the concerning behaviors she had observed and complained that she believed Owen had been mistreating the children in their classroom.

43.     Specifically, Ms. Odiorne reported to Girolimon that she had observed Owen (1) yank children by their arms "like a ragdoll," (2) roughly toss children onto the changing table, (3) cover babies' mouths with her hands or force pacifiers in their mouths in an attempt to make them be quiet; (4) punish children for crying by putting them in the corner of the classroom alone, (5) place one 7-month-old-boy on "tummy

time" for an excessive amount of time while he screamed and cried the entire time, unable to lift his face off the mat; and (6) knowingly leave children alone in their cribs for too long while they cried non-stop.

44.     During the meeting, Owen admitted all of the behaviors described in Paragraph 43 reported by Ms. Odiorne.

45.     Girolimon responded by asking Ms. Odiorne a question to the effect of "Can we just move on and start fresh tomorrow?"

46.     Girolimon's request violated Riverhouse's own Child Abuse Reporting Procedures, which impose specific and strict requirements on Riverhouse when it receives a complaint of child abuse.

47.     Shockingly, Girolimon neither expressed genuine concern for the children nor indicated that Owen would be disciplined or fired for her admitted aggressive behavior toward the children that had been reported by two separate witnesses.

48.     Ms. Odiorne rejected Girolimon's suggestion that she should simply forget about Owen's behaviors and move on as if nothing had happened.

49.     Owen took the following week off work.

50.     When Owen returned to work at Riverhouse during the week of January 27, 2020, Riverhouse placed her in the "Sparrow" classroom for older babies, while Ms. Odiorne remained in the Hummingbird classroom.

51.     Though Ms. Odiorne is certified to be a Lead Teacher and could have easily served in the role of Lead Teacher in Owen's absence, Riverhouse instead chose to bring in a temporary substitute named Kaycie Soper to fill Owen's spot.

52.     While Owen was still working in the Sparrow classroom, Girolimon and Executive Director Darla Andersen followed up with Ms. Odiorne and asked her to make a written statement documenting all of Owen's inappropriate and aggressive behaviors that she had observed.

53.     Ms. Odiorne submitted the written statement as requested, and documented in writing the incidents she had described to Colombe during their January 16 meeting.

**_Riverhouse begins retaliating against Ms. Odiorne for her child abuse complaints by manufacturing performance concerns and threatening to fire her._**

54.     On February 4, 2020, Girolimon and Andersen summoned Ms. Odiorne into the office to meet with them.

55.     During the meeting, Girolimon and Andersen stated that the written statement Ms. Odiorne had prepared documenting Owen's abusive behaviors was "threatening." Girolimon and Andersen insinuated that Ms. Odiorne would be fired if she and Owen could not "get along" working together in the Hummingbird classroom.

56.     Because of the threat of termination, Ms. Odiorne understood the clear message from Girolimon and Andersen that Riverhouse was forbidding her from making further complaints about Owen's behavior.

57.     During the February 4 meeting, Girolimon also told Ms. Odiorne that if Ms. Odiorne saw Owen becoming rough with the children, she should just "take over" and ask Owen to "take a break."

58.     During the February 4 meeting, Girolimon also asked Ms. Odiorne to sign a document titled "Performance Planning Worksheet," which contained a number of goals.

59.     During the February 4 meeting, Girolimon and Andersen told Ms. Odiorne that she was not being disciplined.

60.     But Riverhouse now claims that the "Performance Planning Worksheet" document was a disciplinary write-up which provides a legitimate non-retaliatory reason for its decision to fire Ms. Odiorne just a few weeks later in retaliation for her complaints.

61.     After her February 4 meeting with Girolimon, Ms. Odiorne knew that Riverhouse was not taking her complaints seriously and that Riverhouse would allow Owen's behavior to continue escalating if she did not take action.

62.     To ensure that the children in Riverhouse's care were being protected by someone, in early February 2020 Ms. Odiorne made a formal complaint of child abuse to the La Plata County Department of Human Services.

63.     Riverhouse retaliated by firing Ms. Odiorne within approximately four weeks of her first child abuse complaint.

***Ms. Odiorne applies for the Hummingbird classroom's Lead Teacher position, and Girolimon instead actively seeks out and hires a 20-year-old who had not submitted a timely application.***

64.     On February 18, 2020, Ms. Odiorne approached Girolimon and asked for an update about Owen's employment status at Riverhouse. Ms. Odiorne's goal was to determine if Riverhouse planned to take any disciplinary steps against Owen for her abusive behaviors. Girolimon refused to give Ms. Odiorne any information.

65.     During her February 18 conversation with Girolimon, Ms. Odiorne also stated that she knew Kaycie Soper (the substitute Lead Teacher in the Hummingbird classroom) was leaving Riverhouse soon to start a new job. Ms. Odiorne to Girolimon that she wanted to be considered for promotion into the position.

66.     Ms. Odiorne went on to explain her qualifications to Girolimon. Specifically, Ms. Odiorne explained that, among other things, she is Lead Teacher certified and that she had 2.5 years of experience successfully working with children in a classroom setting. In addition, Ms. Odiorne explained that she had effectively functioned as Lead Teacher for the previous several weeks in Owen's absence because she was the most experienced caretaker present in the classroom.

67.     Girolimon responded that Ms. Odiorne would be required to interview for the position if she wanted to be considered.

68.     Throughout Ms. Odiorne's employment, Riverhouse had not previously required other current employees applying for an internal promotion to Lead Teacher to interview for the position.

11

69.     Ms. Odiorne submitted her application for the Lead Teacher position before the submission deadline and interviewed for the position.

70.     Ms. Odiorne was qualified for the Hummingbird classroom Lead Teacher position.

71.     At the time Ms. Odiorne applied for the Hummingbird classroom Lead Teacher position, Ms. Odiorne was 48 years old.

72.     On February 21, 2020, Darla Andersen entered Ms. Odiorne's classroom and handed her a letter that the La Plata County Department of Human Services had mailed to Riverhouse addressed to Ms. Odiorne.

73.     The letter contained an update on the status of Ms. Odiorne's child abuse complaint, and stated that the agency had referred her complaint to the Colorado Department of Human Services for further assessment.

74.     Thus, upon information and belief, as of February 21, 2020, at the very latest, Andersen knew that Ms. Odiorne had contacted governmental authorities about her abuse complaints.

75.     Riverhouse fired Ms. Odiorne less than three weeks later.

76.     On February 27, 2020, Andersen provided Ms. Odiorne a letter stating that Ms. Odiorne had not been selected for the Lead Teacher position. Instead, Riverhouse selected an approximately-20-year-old employee named Lexi Dalton.

77.     Ms. Odiorne was puzzled to hear that Lexi had been selected for the position because Dalton had previously told Ms. Odiorne that she was not interested in the position and had decided not to apply.

78.     Ms. Odiorne then asked Dalton how she had been hired. Dalton explained to Ms. Odiorne that one day after the application deadline had passed, Girolimon had approached her, handed her an application, and asked her to fill it out.

79.     Soon after affirmatively seeking Dalton out and asking her to apply, Girolimon hired Dalton.

80.     Ms. Odiorne was understandably upset that, after having passed her over for promotions multiple times already, Girolimon had excluded her from the position by actively seeking out a much younger candidate who had not even timely applied.

81.     On February 28, 2020, the Colorado Department of Human Services ("CDHS") conducted a site visit at Riverhouse as part of its investigation into Ms. Odiorne's abuse complaint.

82.     In addition to observing the Hummingbird classroom and reviewing files, the CDHS investigator interviewed Girolimon, Andersen, Owen, and Ms. Odiorne.

83.     As a result of the site visit and the interviews, the CDHS investigation concluded that Ms. Odiorne's abuse complaint of "rough handling" was founded.

84.     The CDHS investigation also concluded that Riverhouse had violated Colorado law by failing to report an allegation of abuse or neglect to the appropriate authorities within 24 hours.

***Ms. Odiorne complains of age discrimination, and Riverhouse immediately fires her in retaliation for her child abuse and age discrimination complaints.***

85.     The Monday after the site visit by CDHS, on March 2, 2020, Ms. Odiorne made a complaint of age discrimination to Andersen.

86.     Specifically, Ms. Odiorne complained to Andersen that Riverhouse had discriminated against her by excluding her from the vacant Lead Teacher position in favor of a less-qualified 20-year-old employee.

87.     As part of her age discrimination complaint, Ms. Odiorne explained that not only had Riverhouse departed from its usual practices by requiring formal applications from current employees, but also Girolimon had actively solicited Dalton to apply for the job after the application deadline had passed.

88.     While making her discrimination complaint to Andersen, Ms. Odiorne requested a copy of her personnel file.

89.     Within days of Ms. Odiorne's age discrimination complaint, Riverhouse fired Ms. Odiorne in retaliation for her reports of child abuse and her complaint of discrimination.

90.     On March 11, 2020, Darla Andersen called Ms. Odiorne to the office at the end of the day. Andersen started the meeting by indicating that she had compiled a copy of Ms. Odiorne's personnel file, as Ms. Odiorne had requested.

91.     Andersen then said words to the effect of "this is just not working out" and fired Ms. Odiorne.

92.    Two days later, on March 13, 2020, Ms. Odiorne went to Riverhouse to pick up her final paycheck.

93.    While meeting with Andersen and Girolimon, Ms. Odiorne asked for details about why she had been terminated. They responded that she had been terminated because she had received three disciplinary write-ups, which they claimed automatically results in termination under Riverhouse policy.

94.    Ms. Odiorne objected that the personnel file Andersen had given her contained only one disciplinary write-up, which she had received in September of 2019.

95.    They responded that Riverhouse considered the "Performance Planning Worksheet" Girolimon had given her in February 2020 to be a disciplinary write-up. They also claimed that Ms. Odiorne had also been written up on March 11, the day of her termination. According to Riverhouse, Ms. Odiorne had been disciplined on the day of her termination because one of the children in her classroom had picked up a bottle that belonged to another child.

96.    Andersen and Girolimon also claimed that Ms. Odiorne had been disciplined because one of the children in her classroom had been seen in a photograph handling a spray bottle of bleach months earlier.

97.    Both Owen and Pepin had been present in the classroom while the child picked up a bottle of bleach. Upon information and belief neither was disciplined.

98.    But Riverhouse did not inform Ms. Odiorne about two of her three instances of supposed discipline until after her termination.

99.     Ms. Odiorne was not genuinely terminated for legitimate reasons, performance-related or otherwise. Rather, Riverhouse unlawfully retaliated against Ms. Odiorne.

100.    Riverhouse began manufacturing false and pretextual performance issues to justify its retaliatory termination of Ms. Odiorne in early 2020 just after her first complaint of child abuse in Riverhouse's Hummingbird classroom.

101.    Riverhouse fired Ms. Odiorne in retaliation for her complaints of child abuse and age discrimination.

***In addition to firing Ms. Odiorne, Riverhouse went to extraordinary lengths to protect itself and Owen from consequences, including by lying to the parents of children victimized by Owen.***

102.    But Serena Owen – who was the subject of multiple child abuse complaints substantiated by a governmental investigation – continued to work at Riverhouse until she voluntarily left Riverhouse to accept a job at Florida Mesa Elementary School within the Durango School District 9-R.

103.    In addition to protecting an employee who Riverhouse knew to have engaged in child abuse against the babies in her care, Riverhouse actively misled the parents of Owen's victims to conceal her abuse and protect itself from consequences.

104.    For instance, in or about February 2020, Girolimon and Erin Dale (President of Riverhouse's Board of Directors) contacted the parents of Baby One and asked them to come to Riverhouse for a meeting.

105.   In the meeting, Girolimon and Dale told Baby One's parents that Riverhouse was experiencing "personnel issues" in the Hummingbird classroom, and that Riverhouse was in the process of "letting go" a "disgruntled employee" (*i.e.* firing Ms. Odiorne).

106.   Girolimon and Dale vaguely told Baby One's parents that the "disgruntled employee" had made complaints about goings-on in the Hummingbird classroom, and that they had informed all the parents of affected children.

107.   Girolimon and Dale falsely insinuated to Baby One's parents that Ms. Odiorne's child abuse complaints had been unfounded.

108.   Girolimon and Dale refused to tell Baby One's parents any specifics about the complaints made by Ms. Odiorne, and did not inform Baby One's parents that their child was the victim of at least one of Owen's fits of anger.

109.   As part of Riverhouse's efforts to conceal Owen's abuse and protect her and Riverhouse from consequences, Girolimon and Dale lied to the parents of a then-non-verbal baby victimized by Owen.

## FIRST CLAIM FOR RELIEF
(Retaliation in Violation of the ADEA, 29 U.S.C. § 623(d))

110.   Plaintiff incorporates all allegations in this Complaint and Jury Demand into this First Claim for Relief.

111.   Plaintiff engaged in protected activity under the ADEA on March 2, 2020 by complaining to Riverhouse Executive Director Darla Anderson that Riverhouse had

discriminated against her in the hiring process for the Hummingbird classroom Lead Teacher position.

112. Riverhouse knew that Plaintiff had engaged in protected activity under the ADEA by complaining of age discrimination.

113. In retaliation for Plaintiff's exercise of her federally-protected right to make a good-faith complaint of age discrimination, Riverhouse terminated Plaintiff from her employment.

114. Defendant's unlawful acts toward Plaintiff have caused and continue to cause Plaintiff damages, injuries, pain and suffering, inconvenience, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other damages and expenses.

## SECOND CLAIM FOR RELIEF
(Wrongful Discharge in Violation of Public Policy)

115. Plaintiff incorporates all allegations in this Complaint and Jury Demand into this Second Claim for Relief.

116. On January 16, 2020, Defendant instructed Plaintiff to "move on and start fresh tomorrow" after Plaintiff reported child abuse she had observed which was committed by Serena Owen at Riverhouse.

117. Complying with Defendant's instruction to "move on and start fresh" would have caused Plaintiff to violate C.R.S. § 19-3-304, which mandates certain entities and individuals to report known or suspected child abuse to governmental authorities.

118.    Rather than violate C.R.S. § 19-3-304, as instructed by Defendant, Plaintiff made a formal report of child abuse at Riverhouse to the La Plata County Department of Human Services.

119.    Defendant was aware or reasonably should have been aware that Plaintiff's refusal to "move and start fresh" after her report of child abuse was based on Plaintiff's reasonable belief that the action ordered was illegal, contrary to clearly expressed statutory policy relating to Plaintiff's duty as a citizen, or violative of Plaintiff's legal right or privilege as a worker.

120.    Defendant was aware or reasonably should have been aware that Plaintiff exercised an important job-related privilege or right by reporting child abuse at Riverhouse, both internally and to governmental authorities.

121.    Defendant retaliated against Ms. Odiorne for refusing to violate C.R.S. § 19-3-304 by passing her up for a promotion, disciplining her, and terminating her employment.

122.    Defendant retaliated against Ms. Odiorne for reporting child abuse at Riverhouse to governmental authorities by passing her up for a promotion, disciplining her, and terminating her employment.

123.    Defendant's conduct violated the public policy of the State of Colorado.

124.    Defendant's conduct was willful and wanton and attended by circumstances of malice and reckless disregard for the rights of Ms. Odiorne.

125.    Defendant's unlawful acts toward Plaintiff have caused and continue to cause Plaintiff damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

### THIRD CLAIM FOR RELIEF
(Outrageous Conduct)

126.    Plaintiff incorporates all allegations in this Complaint and Jury Demand into this Third Claim for Relief.

127.    Defendant engaged in extreme and outrageous conduct, as described above.

128.    Defendant engaged in such conduct recklessly or with the intent of causing Plaintiff severe emotional distress.

129.    Defendant's conduct caused Plaintiff severe emotional distress.

130.    Defendant was in a position of power or authority over the Plaintiff because Defendant was Plaintiff's employer.

131.    As direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff suffered damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests:

1.      That this Court assume jurisdiction;

2.      That this Court enter judgment in Plaintiff's favor and against Defendant;

3.      That this Court declare the actions of Defendant described in this Complaint and Jury Demand to be in violation of the Age Discrimination in Employment Act;

5.      That this Court declare the actions of Defendant described in this Complaint and Jury Demand to be in violation of the public policy and the common law of the State of Colorado.

5.      That this Court award Plaintiff all appropriate relief at law and equity, including but not limited to back pay with pre-judgment interest, front pay, a gross-up adjustment for taxes and any subrogation interests and all other make whole relief, including all available consequential/compensatory/liquidated damages;

6.      That this Court grant compensatory and consequential damages against Defendant, including but not limited to damages for emotional distress, humiliation, embarrassment, loss of income and enjoyment of life, and other pain and suffering on all claims by law in the amount to be determined at trial against the Defendant, as allowed by law;

7.      That this Court grant exemplary and/or punitive damages as allowed by

law.

      8.     That this Court award Plaintiff her attorney fees and costs of this action, including expert witness fees, on all claims allowed by law;

      9.     That this Court award pre-judgment and post-judgment interest at the highest lawful rate; and

      10.    That this Court award such additional or alternative relief as may be just, proper and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

Respectfully submitted this 25th day of May, 2021 by:

SWAIN LAW, LLC

/s/ Hunter A. Swain
Hunter A. Swain
1490 North Lafayette Street, Suite 303
Denver, CO 80218
Tel: (720) 815-5281
Email: hunter@swainemploymentlaw.com

Attorney for Plaintiff

Plaintiff's Address:     Lisa Marie Odiorne
                         8199 North Lake Boulevard, #3
                         Kings Beach, CA 96143